## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

**PAULA Y. WATSON**                           **CIVIL ACTION**

**VERSUS**                                    **NUMBER: 20-2901**

**UNITED STATES POSTAL SERVICE**              **DIVISION "5"**

## <u>ORDER</u>

Before the Court is the Motion for Summary Judgment filed by Louis DeJoy, Postmaster General on Behalf of the United States Postal Service ("USPS"). (Rec. Doc. 15). Plaintiff opposes the motion, (Rec. doc. 19), and the USPS has filed a reply. (Rec. doc. 22). Having reviewed the pleadings and the case law, the Court rules as follows.

**I.      Factual Background**

Plaintiff, Paula Y. Watson, is a black female who was hired as a city letter carrier by the USPS in 1999. (Rec. doc. 1 at ¶ 3). Plaintiff alleges that she was required to work in a racially hostile work environment that was created by Leslie Golden (white female), her Postmaster at the Mandeville USPS Office. (*Id.* at ¶¶ 4-5). Plaintiff alleges that "Golden engaged in a persistent, pervasive, offensive, unwelcomed, and illegal course of conduct directed to and/or in the presence of Plaintiff by subjecting her to false allegations, requiring that she notify a supervisor when needing to use the bathroom, issuing Plaintiff Letters of Warning for behavior in which she did not exhibit, charging Plaintiff with conduct and suspending Plaintiff for actions which she did not undertake. . . ." (*Id.* at ¶ 5).

Plaintiff claims that Golden's and her other supervisors' behavior (as outlined below) amounted to disparate-treatment race discrimination and retaliation and created a racially hostile work environment. (*Id.* at ¶¶ 5, 29, 32). Plaintiff contends that other

coworkers of color (one Latino and five Black co-workers over a period of nine months) were also involuntarily separated from their employment for engaging in behavior for which her white coworkers were not disciplined and/or removed.  (*Id.* at ¶ 5).

Plaintiff maintains that on October 4, 2019, her direct supervisor, Adam Taylor (white male), falsely accused her of stealing documents and of making threatening remarks about Golden.  (*Id.* at ¶ 8).  On the morning of October 4, 2019, Taylor questioned Plaintiff about some of Golden's notes that were missing.  (*Id.*).  Taylor allegedly falsely stated that he had observed Plaintiff on her way to the printer that afternoon, leaving the printer area, and that 10 minutes later, he discovered Golden's missing notes "directly on top of the printer."  (*Id.*).  Plaintiff was then interrogated about her knowledge of Golden's notes after Plaintiff had earlier stated to Taylor that she already had knowledge of the information contained in the documents.  (Rec. doc. 15-8 at ¶ 5).  Plaintiff failed to explain to Taylor how she had gained knowledge of the information in the missing documents.   (Rec. doc. 15-7 at ¶ 11).  Plaintiff denied that she had ever possessed the documents and alleged that she was being set up and/or harassed.  (*Id.* at ¶ 12).  Taylor later denied accusing Plaintiff of stealing the documents, (Rec. doc. 15-8 at ¶ 5), but testified that when he questioned Plaintiff as to her knowledge of the documents, she replied, "I've got something for that bitch" (allegedly referring to Golden).  (Rec. doc. 15-8 at ¶ 6, 16).

Plaintiff received a letter of warning from Taylor for improper conduct and creating a hostile work environment on October 24, 2019, due to this incident.  (Rec. doc. 1 at ¶ 9; Rec. doc. 15-8 at ¶ 16).  Both Taylor and Golden testified that neither Plaintiff's race nor color was a factor in their handling of this situation, (Rec. doc. 15-7 at ¶¶13-14; Rec. doc. 15-8 at ¶¶ 9-10), and Golden further stated in her declaration that Plaintiff's integrity was

often in question at the office.  (Rec. doc. 15-7 at ¶ 9).  The letter of warning was later expunged from all records and files.  (Rec. doc. 15-6).

The next day, October 5, 2019, Plaintiff alleges that she was advised by her supervisor Charae Flemings (black female), at the direction of Golden, that she needed to ask permission to leave her work area, including when she needed to use the restroom. (Rec. doc. 1 at ¶ 12).  Flemings later testified that she never gave any employee specific written instructions regarding leaving their work area and that she merely informed all employees that if they were away from their work area, she needed to know where they were.  (Rec. doc. 15-9 at ¶¶ 9-10).  Flemings informed all of the employees that if she saw them away from their work areas, they needed to let her know where they were going. (*Id.*).  This applied to *everyone*, not just Plaintiff.  (*Id.*)

The postal rule, regulation, and/or policy that applies in this situation is M-41, which states that carriers should be at their work area casing their mail, not loitering on the floor.  (*Id.* at ¶ 11).  Flemings testified that neither Plaintiff's race nor color was a factor in how she handled this situation.  (*Id.* at ¶¶ 15-16).  Golden affirmed that she never instructed Plaintiff to ask permission to leave her work area and to notify a supervisor when she needed to use the bathroom.  (Rec. doc. 15-7 at ¶ 15).  Golden is not aware of any carriers that are required to request permission to use the bathroom.  (*Id.* at ¶ 17).  Rather, Taylor testified that all USPS carriers in the office were advised not to leave their work area without notifying a supervisor.  (Rec. doc. 15-8 at ¶ 11).  Both Taylor and Golden testified that race was not a factor in their handling of this situation.  (Rec. doc. 15-7 at ¶¶ 13-14; Rec. doc. 15-8 at ¶¶ 14-15).  However, Plaintiff's co-workers Arnold Sylve and Lionel Kinler both testified that Plaintiff was the only individual who needed to ask permission to use the

3

restroom and that her white coworkers were neither required to ask nor needed permission to use the restroom.  (Rec. doc. 19-3 at ¶¶ 11-12; Rec. doc. 19-4 at ¶¶ 5-6).

Over a month later, Plaintiff was handed a seven-day suspension for falsifying time records by requesting a "no lunch" period on November 2, 2019.[1]  Plaintiff submitted Form 3971 for a "no lunch" period" on November 2, 2019, which Flemings approved.  (Rec. doc. 15-10).  Golden testified that Plaintiff's submission of Form 3971 on November 2, 2019 in which she requested a "No Lunch" waiver of 30 minutes constituted a falsification of time records.  (*Id.* at ¶ 21).  Management reviewed DMS[2] data for November 2, 2019, which revealed that Plaintiff had idle time from 12:45-13:15.  (*Id.*).  Management also reviewed GPS data from RIMS[3] and implemented the RIMS Manager for this time period.   (*Id.*).  Management discovered that Plaintiff was idle behind a business at 620 Lotus Drive in Mandeville.  (*Id.*). During the investigative interview of the "30 missing minutes," Plaintiff stated that she did not take a 30-minute lunch break on November 2, 2019.  (*Id.* at ¶ 22).  Plaintiff also stated that she performed "deliveries" at 620 Lotus Drive during that time.  (*Id.* at ¶ 23).  When asked what her actions were during the 30 minutes of idle time, Plaintiff stated, "delivering, reloading, and I also gave a customer some directions."  (*Id.*).

On the afternoon of November 7, 2019, Postmaster Turcherelli[4] visited Brown and Brown Insurance ("Brown") located at 620 Lotus Drive to conduct an investigation and spoke with Glen Nunenmacher, a claims investigator at Brown.   (*Id.* at ¶ 24).

---

[1] A "no lunch" period is when an employee such as Plaintiff opts to work through the time of her lunch break.
[2] This term is not defined in the pleadings.
[3] This term is also not defined in the pleadings.
[4] No given name is provided for Turcherelli.  Moreover, the pleadings are entirely unclear on the presence of a Postmaster at the Mandeville Post Office during this time frame.  While the USPS labels Turcherelli as the Postmaster on November 7, 2019, Defendant Golden declared that "[t]here was no Postmaster at the Mandeville Post Office from February 2019 through February 2020 due to a hiring freeze."  (Rec. doc. 15-7 at ¶ 3).  Contrarily, Plaintiff contends that Golden was the Postmaster during her period of employment.  (Rec. doc. 19 at p. 1).

Nunenmacher informed Turcherelli that Brown is closed on Saturday and that the business had not received any mail on Saturday, November 2, 2019.  (*Id.*).  Nunenmacher offered video surveillance of the back parking lot to assist in the investigation, which indicated that there was no reload of the vehicle by Plaintiff and that there was no delivery of mail or approach to any business for delivery on November 2, 2019.  (*Id.* at ¶¶ 25-26).

The USPS conducted a follow-up investigation with Plaintiff on November 13, 2019 during which it showed Plaintiff the entire video surveillance.  (*Id.* at ¶ 27).  When questioned as to statements that she had made in the previous investigative interview, Plaintiff defended herself by stating that the camera did not show the entire location.  (*Id.*).  When asked to explain in detail her actions during the 30 minutes of idle time, Plaintiff simply stated that "it was not 30 minutes of idle time."  (*Id.* at ¶ 29).  Ultimately, Plaintiff offered the USPS no explanation of what work duties she performed for it during the 30 minutes of idle time on November 2, 2019.  (*Id.* at ¶ 30).  Golden then concurred with regard to Plaintiff's seven-day suspension that she received on November 25, 2019 for her actions that occurred on November 2, 2019.  (Rec. doc. 15-7 at ¶ 20).

It is clear that Plaintiff submitted a form in which she requested a "no lunch" period on November 2, 2019 that was approved.  (Rec. doc. 15-10).  Plaintiff also submitted Form 3996, in which she requested overtime for November 2, 2019 (because she allegedly had not taken a lunch break) that was initially approved.  (Rec. doc. 15-11).  However, once the USPS learned that Plaintiff had not worked overtime because she had taken a 30-minute lunch break, her Form 3996 was later disapproved.  (*Id.*).  As a result of the disapproval of

her Form 3996, Plaintiff alleges that her clock rings[5] were deleted maliciously so that management could falsely claim that her time was not approved, and it could seek harsher discipline or separation from her employment.  (Rec. doc. 1 at ¶ 19).

Plaintiff also alleges that her white coworkers including, but not limited to, Kirk Bodenheimer, Paul Benoit, and Brian Abadie are all letter carriers who hold the same or similar jobs to Plaintiff and have been involved in conduct of which Plaintiff had been accused but who were not subject to any discipline.  (Rec. doc. 19-2 at ¶ 18).  Bodenheimer allegedly made comments that management at the Mandeville Post Office was dumb, stupid, and had no clue what they were doing, but he was never subject to any discipline.  (*Id.*).   Benoit allegedly cursed and threw parcels at management in June 2019 and was subject to no discipline.  (*Id.*).   On September 7, 2019, Abadie allegedly told management that he was "sick of this shit and was going home" and was not subject to any discipline.  (*Id.*).  Plaintiff also alleges that numerous white coworkers "stole time" and yet were never subjected to discipline like her.  (*Id.* at ¶¶ 19-21).

However, Plaintiff's union representative, Kinler, testified:

[i]n those grievances [that he filed,] I mentioned, one shows a black carrier that is fired for unscheduled absences and being AWOL, while a white carrier is late every day and not marked AWOL one time.  Another grievance shows a black carrier getting fired for backing into a mailbox and only causes damage to the mailbox.  A white carrier backs into a driveway, which were instructed not to do [sic], and hits a tree branch that causes significant damage to the back of the mail truck and he gets a Letter of Warning reduced to a year.  A white female carrier has a roll away vehicle and gets a Letter of Warning reduced to a year.  Then this same white female carrier about 3 months later backs into a car in a Smoothie King parking lot and management does not even do an investigative interview on her.  There are many more examples that I, Lionel Kinler, could give.  If a black carrier, especially Paula Watson and Arnold Sylve [Black mail], steps out of their case, management

---

[5] While this term is undefined in the pleadings, for purposes of this opinion, the Court assumes that the term refers to the time-keeping system at the USPS.

immediately tells them to get back in their case.  But you will have the same 3 white carriers out of their cases all morning and not a word said to them. That's just a tiny example.  Not only the minorities get treated unequally and receive harsher punishments, but females are constantly being disrespected and bullied.

(Rec. doc. 1 at ¶ 16; Rec. doc. 19-3 at ¶¶ 4-10).[6]

On March 15, 2020, Plaintiff filed a formal complaint with the Equal Employment Opportunity Commission ("EEOC").  (Rec. doc. 15-6).  The EEOC accepted the complaint for investigation, investigated Plaintiff's claim, and transmitted the results of the investigation to Plaintiff on May 27, 2020.  (Rec. docs. 15-4, 15-5).  The EEOC accepted the following claims for investigation:

1.   On October 4, 2019, she was accused of stealing documents.;
2.   On October 5, 2019, she was told she would need to ask permission to leave her case and notify a supervisor when she needed to go to the bathroom.;
3.   On October 25, 2019, she was issued a Letter of Warning for Improper Conduct/Creating a Hostile Work Environment.;
4.   On November 5, 2019, her clock rings were deleted.; and
5.   On November 25, 2019, she was issued a Notice of Seven (7) Day Suspension for Conduct/Falsification of Records.

(Rec. Doc. 15-4 at p. 1; Rec. doc. 15-5 at p. 1).

As Plaintiff failed to request either a hearing or a final agency decision without a hearing, the EEOC issued a decision in accordance with 29 C.F.R. § 1614.110(b).  (Rec. doc. 15-4).  On July 27, 2020, the EEOC concluded:

After carefully considering the entire record, and applying the legal standards outlined in <u>McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792 (1973); and <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17 (1993) and

---

[6] Plaintiff also cites to numerous other instances of discrimination but cites to no more than her own complaint. *See, e.g., Conticarriers & Terminals, Inc. v. Van Fleet, Ltd.*, No. CIV. A. 94-727, 1995 WL 341583, at *1 (E.D. La. June 7, 1995) ("To overcome a summary judgment motion, the plaintiff must come forth with some evidence to support the allegations set forth in the pleadings. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The USPS recognizes in their reply memorandum (Rec. doc. 22), and this Court also recognizes, that allegations in a complaint are no more than that – allegations.

Burlington Industries, Inc. v. Ellerth. 524 U.S. 742 (1998) (applying to harassment cases); the evidence does not support a finding that the complainant was subjected to discrimination as alleged. Consequently, this complaint is now closed with a finding of no discrimination.

(Rec. doc. 15-4 at p. 22).

On October 23, 2020, Plaintiff filed her complaint in this Court in which she asserts Title VII employment-discrimination claims against the USPS for race-based disparate treatment, hostile work environment, and retaliation. (Rec. doc. 1). While Plaintiff sues only the USPS, she alleges that she was the victim of racial discrimination by her direct supervisors Taylor, Flemings, and Golden. (*Id.*).

## II.    Summary Judgment Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322).

### III.    The *McDonnell Douglas* Standard

"Title VII makes it an unlawful employment practice for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc).  The burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny establish the respective burdens and standards for plaintiffs and defendants on a motion for summary judgment for causes of action under Title VII.  *Duncan v. Univ. of Texas Health Sci. Ctr. at Houston*, 469 F. App'x 364, 368 & n.6 (5th Cir. 2012); *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir. 2005).  Under this framework, Plaintiff has the initial burden of proving a *prima facie* case of retaliation or discrimination by a preponderance of the evidence.  *McDonnell Douglas*, 411 U.S. at 802.  To establish a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting framework, "an employee must demonstrate that she '(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group.'" *Garrison v. Tregre*, No. CV 19-13008, 2021 WL 6050179, at *2 (E.D. La. Dec. 21, 2021) (quoting *Morris v. Town of Independent*, 827 F.3d 396, 400 (5th Cir. 2016) (quoting *Willis v. Cleco Corp.*, 749 F.3d 314, 319-20 (5th Cir. 2014)).  An individual who alleges a retaliation claim under Title VII establishes a *prima facie* case by demonstrating that: (1) she engaged in a protected activity; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse action.  *Septimus*, 399 F.3d at 609.

10

If a *prima facie* case is present, a presumption of retaliation/discrimination arises, and the burden then shifts to the employer to produce a legitimate, nondiscriminatory reason for the alleged adverse employment action. *Broadway v. United States Dep't of Homeland Sec.*, Civ. A. No. 04-1902, 2006 WL 2460752, *3 (E.D. La. Aug. 22, 2006). "Defendant's burden is one of production, not persuasion. . . ." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). A defendant must merely set forth, through admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993). This causes the presumption of discrimination to dissipate. *Smith v. Aaron's Inc.*, 325 F. Supp. 2d 716, 724 (E.D. La. 2004).

At the third stage of the burden-shifting framework, the plaintiff is given a "full and fair opportunity to demonstrate" that the defendant's proffered reason is a pretext for intentional discrimination. *Price v. Fed. Express*, 283 F.3d 715, 721 (5th Cir. 2002) (citing *Hicks*, 509 U.S. at 507-08). On summary judgment at the third step, the plaintiff must substantiate her claim of pretext through evidence demonstrating that discrimination lay at the heart of the employer's decision. *Price*, 283 F.3d at 721. Even when such a showing is made, however, it will not always be enough to prevent summary judgment if no rational factfinder could conclude that the action was discriminatory. *Id.* (citing *Reeves*, 530 U.S. at 148). As the *Reeves* court explained,

> The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct. In other words, it is not enough . . . to *dis*believe [sic] the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.
>
> . . . Certainly there will be instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the

> defendant's explanation, no rational factfinder could conclude that the action was discriminatory.   For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred. . . .

530 U.S. 146-48 (internal citations omitted).  "Whether summary judgment is appropriate depends on numerous factors, including the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered."  *Id.*

## IV.    Law and Analysis

### A.    Disparate Impact Claims

The USPS argues that Plaintiff cannot establish a *prima facie* claim of disparate treatment.   "Disparate treatment refers to deliberate discrimination in the terms or conditions of employment . . . on account of race, national origin, or gender."   *Munoz v. Orr*, 200 F.3d 291, 299 (5th Cir. 2000).   "Disparate-treatment discrimination addresses employment actions that treat an employee worse than others based on the employee's race, color, religion, sex, or national origin.   In such disparate-treatment cases, proof and finding of discriminatory motive is required." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (citing *Pacheco v. Mineta*, 448 F.3d 783, 787 (5th Cir. 2006)).   A plaintiff can prove discriminatory motive through either direct or circumstantial evidence. *Portis v. First Nat'l Bank of New Albany, Miss.*, 34 F.3d 325, 328 (5th Cir. 1994).   When a plaintiff builds a case on circumstantial evidence, a court analyzes the plaintiff's claim under the *McDonnell Douglas* framework.   *See Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir.

2003).  "Under this framework, the plaintiff must first create a presumption of discrimination by making out a prima facie case of discrimination."  *Id.*

To establish a *prima facie* case of disparate treatment, a plaintiff must show that (1) she belongs to a protected group, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) a similarly situated employee outside of her protected group was treated more favorably.  *Watkins v. Tregre*, 997 F.3d 275, 282 (5th Cir. 2021) (citing *Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 593 (5th Cir. 2007)).  As the Fifth Circuit has held, there are two ultimate elements that a plaintiff must plead to support a disparate treatment claim under Title VII: (1) an "adverse employment action," (2) taken against a plaintiff "because of her protected status."  *See Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013) (explaining that a plaintiff must allege "facts, [either] direct or circumstantial, that would suggest [the employer's] actions were based on [the plaintiff's] race or national origin or that [the employer] treated similarly situated employees of other races or national origin more favorably")  (quoting *Kanida v. Gulf Coast Med. Pers. LP*, 363 F.3d 568, 576 (5th Cir. 2004)); *Pacheco*, 448 F.3d at 787 (a "discriminatory motive is required" for disparate treatment claims).  An "[a]dverse employment action[] include[s] only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensation.  An employment action that does not affect job duties, compensation, or benefits is not an adverse employment action."  *Welsh v. Fort Bend Indep. School Dist.*, 941 F.3d 818, 824 (5th Cir. 2019).

Plaintiff alleges that her clock rings were deleted, that she was accused of stealing documents, and that she had to ask permission to go to the bathroom.  The Court finds that these are not "adverse employment actions," as none of these events affected her job

duties, compensation, or benefits.  She was not demoted, her salary was not reduced, nor was she fired or assigned menial job responsibilities as a result of these actions.  With regard to the October 25, 2019 letter of warning and the November 25, 2019 seven-day suspension, both of these incidents were settled through the grievance procedure and were expunged from Plaintiff's record.  (Rec. doc. 15-6).[7]  Indeed, Plaintiff admits that these two incidents were resolved in her favor through the grievance process.  (*Id.*).  Accordingly, Plaintiff's complaints about her letter of warning and suspension did not result in adverse employment decisions and are thus not actionable.  The Court finds that Plaintiff cannot establish the third element of her disparate treatment claim.

Further, as to the fourth element, "there can be no liability without a finding that the protected trait (*e.g.*, race) motivated the challenged action."  *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 909 (5th Cir. 2019) (citation omitted).  Plaintiff has proffered to this Court no evidence that any of her supervisors used race-based language or made any racial insinuation, either verbally or in writing, when they disciplined her.  The only "evidence" to which Plaintiff cites to support her claim of discrimination is that Golden and Taylor are white and that she is black.  (As a reminder, Flemings is also black.)  This is no more than Plaintiff's own subjective belief that race was involved in Taylor's and Golden's decisions concerning her employment.  While the Court recognizes that their statements are self-serving, Golden and Taylor both explained in their attached declarations that none of their actions about which Plaintiff complains concerned Plaintiff's race, and Plaintiff has offered no contrary evidence to support her subjective beliefs.  (Rec. doc. 15-7 at ¶¶ 13, 14, & 32; Rec. doc. 15-8 at ¶¶ 9, 10, 14-15, 19- 20).

---

[7] Plaintiff makes no allegation – and there is no evidence in the record – that the seven-day suspension was without pay.  (Rec. doc. 15-6).

Plaintiff appears to attempt to establish the fourth element of her disparate treatment claim by identifying non-black comparator employees that she believes were treated more favorably.  As the Fifth Circuit has held, however,

> [e]mployees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated.  Employees . . . who are subjected to adverse employment action for dissimilar violations are not similarly situated.  This is because [the Fifth Circuit] require[s] that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken under nearly identical circumstances.  The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.  And, critically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions.

*Lee*, 574 F.3d at 259-260 (citations omitted).

In her EEOC Administrative Claim and in her complaint, Plaintiff identified several co-workers as possible comparators including Kirk Bodenheimer (white male), Paul Benoit (white male), and Brian Abadie (white male).  (Rec. doc. 1 at ¶¶ 10-11).  However, none of these individuals had comparable violation histories.  (Rec. doc 15-7 at ¶¶ 17-19).  None of these employees was reprimanded for disappearing from their workstation, for falsifying records, or for threatening a co-employee.[8]  All three of them, however (and despite Plaintiff's protestations), were in fact disciplined, albeit for various inappropriate comments or outbursts on the workroom floor.  (*Id.*).  Contrary to Plaintiff's argument, her coworkers (generally white males, according to the evidence of record) were disciplined and written up for various infractions.  (*Id.*).  The evidence indicates that USPS did not simply discipline Plaintiff as a black female.  Plaintiff cannot establish that any of her white

---

[8] *See supra* p. 2. ("I've got something for that bitch" (allegedly referring to Golden).  (Rec. doc. 15-8 at ¶ 6, 16)).

male co-workers were similarly situated to her and were not disciplined for their infractions. Accordingly, Plaintiff cannot satisfy the third and fourth elements of her *prima facie* disparate treatment claims, and the Court rejects this claim.[9]

### B.    Hostile Work Environment Claims

Title VII also makes it unlawful for employers to require "people to work in a discriminatorily hostile or abusive environment."  *West v. City of Houston, Tex.*, 960 F.3d 736, 741, (5th Cir. 2020) (citing *Gardner v. CLC of Pascagoula, L.L.C.*, 915 F.3d 920, 325 (5th Cir. 2019) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  *Id.* (citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e-5(e)(1)).  To survive summary judgment on a hostile work environment claim based on race or sex discrimination, a plaintiff must show that (1) she is a member of a protected class; (2) that she was subject to unwelcome harassment; (3) that the harassment was based on her protected class status; (4) the harassment "affected a term, condition or privilege of employment"; and (5) "that the employer knew or should have known" about the harassment and "failed to take prompt remedial action."  *Id.* (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).  The last element may not apply when the harassment is committed by a supervisor who is responsible for the terms and conditions of the plaintiff's employment, for the plaintiff's work assignment within the company, or for hiring or firing decisions.  *See Nash v. Electrospace System, Inc.*, 9 F.3d 401, 404 (5th Cir. 1993).

---

[9] Given that this Court has determined that Plaintiff cannot make a *prima facie* case of disparate impact, the Court need not determine whether the USPS has proffered a legitimate non-discriminatory reason for its actions.

To affect a term, condition or privilege of employment, the harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.  *Id.* (citing *Aryian v. Walmart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008)).  The conduct must be objectively and subjectively hostile or abusive.  *Id.* (citing *Harris*, 510 US at 21-22).  The totality of the employment circumstances determines whether an environment is objectively hostile. *Id.* (citing *Harris*, 510 U.S. at 23).  Although no single factor is determinative, pertinent considerations are: (1) "the frequency of the discriminatory conduct"; (2) "its severity"; (3) "whether it is physically threatening or humiliating, or a mere offensive utterance"; and (4) "whether it unreasonably interferes with an employee's work performance."  *Id.*

Given the evidence before it, this Court cannot state at this time that Plaintiff cannot establish a *prima facie* case of a hostile work environment.  The affidavits of Lionel Kinler and Arnold Sylve submitted on behalf of Plaintiff cannot be ignored.  Kinler testified variously:

> I became aware of the instances in which white employees of the United States Postal Service were being treated differently than minority employees in the Mandeville Post Office when I began filing grievances during the time period including, but not limited to, October and November 2019.
> I have witnessed minority carriers including, but not limited to, Paula Watson treated unequally and receive harsher punishments than white carriers for similar if not the exact same alleged offenses.
> I witnessed the morale of the minority employees and, specifically, African-American (black) drop tremendously when Leslie Golden began serving as Postmaster in the Mandeville Post Office.
> I have witnessed Leslie Golden bully and intimidate African-American (black) carriers including, but not limited to, Paula Watson by constantly issuing discipline.
> I have observed an African-American (black) carrier being fired for unscheduled absences, while a white carriers are late every day and receive no discipline or being marked AWOL on a single occasion.
> I have observed Caucasian (white) carriers being involved in motor vehicle accidents during the course and scope of their employment with the USPS

and receive letters of warning, while African-American carriers are
terminated for the same alleged offense.
As it relates to Ms. Watson, during the time frame at issue, namely the fall of
2019, if Ms. Watson stepped out of her case, management immediately told
her to get back in her case. But at the same time her Caucasian (white)
coworkers received no such instruction.
Ms. Watson was instructed that she needed permission to use the restroom
while her Caucasian (white) coworkers required no such permission.

(Rec. doc. 19-4).

Sylve also testified variously:

During the fall of 2019, I became aware that Ms. Watson's manager, Charae
Flemings instructed Ms. Watson that she had to have permission to use the
restroom. Ms. Flemings acknowledged she gave this instruction to Ms.
Watson in my presence.
Based upon my knowledge, neither Ms. Flemings nor any other supervisor at
the Mandeville Post-Office instructed Ms. Watson's white coworkers that
they needed permission to use the restroom.

(Rec. doc. 19-5).

The testimony that Plaintiff has submitted in support of her version of the facts is
neutral, as are the attached declarations of Golden, Taylor, and Flemings in which they
simply testify that Plaintiff's race was not a motivating factor in their decisions.   The
evidence before the Court could reasonably support both sides of the facts outlined here to
some degree.   Indeed, the evidence could lead a rational trier of fact to find for Plaintiff or
the USPS based on such things as credibility determinations, which this Court cannot make.
While the Court recognizes that the standards to establish a hostile work environment "are
sufficiently demanding to ensure that Title VII does not become a general civility code,"
*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998), the Court cannot state that no
genuine issue of material facts exists with regard to Plaintiff's hostile work environment
claim.   The affidavits of Plaintiff's two fellow co-workers, that of Plaintiff herself, and the
declarations of Golden, Taylor, and Flemings are enough to satisfy the Court that there are

questions in this lawsuit for a factfinder, and not this Court.  For these reasons, the Court denies the USPS's motion for summary judgment on this claim.

### D.    Retaliation

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in a Title VII protected activity; (2) she was subject to an adverse employment action; and (3) there was a but-for causal connection between her employment in the protected activity and the adverse employment action.  *Harville v. City of Houston, Miss.*, 945 F.3d 870, 879 (5th Cir. 2019); *Washington v. Bd. of Supervisors for Univ. of La. Sys.*, 297 So.3d 69, 72 (La. Ct. App. 2020).   An employee has engaged in activity protected by Title VII if she has either (1) "opposed any practice made an unlawful employment practice" by Title VII or (2) "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).  *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996).  The opposition clause of § 2000e-3(a) requires the employee to demonstrate that she had at least a "reasonable belief" that the practices she opposed were unlawful.  *See id.* (citing *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. 1981)).

The Fifth Circuit has previously held that the burden-shifting structure applicable to Title VII disparate treatment cases, as set forth in *McDonnell Douglas Corp.* is also applicable to Title VII unlawful retaliation cases. *Id.* at 304-05 (citing *McMillan*, 710 F.2d at 1116). Therefore, once the plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  *McMillan*, 710 F.2d at 1116.  If the defendant introduces evidence which, if true, would permit the conclusion that the adverse employment action

was nondiscriminatory, the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff.  *Id.*

It is also well-settled law that before a plaintiff can bring an action in federal court under Title VII, she must first exhaust available administrative remedies.  *See* 42 U.S.C. § 2000e-5(f)(1); *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002); *Ellzey v. Cath. Charities Archdiocese of New Orleans*, 833 F. Supp. 2d 595, 599-600 (E.D. La. 2011); *Reed v. Northrop Grumman Ship Sys. Inc.*, No. Civ. A. 04-1214, 2004 WL 2115596, at *1 (E.D. La. Sept. 17, 2004).  Title VII's exhaustion requirement is satisfied only if a plaintiff files a timely charge with the EEOC and receives a statutory right-to-sue notice.  *Taylor*, 296 F.3d at 378-79 (citing *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996)).  Failure to comply with this requirement will result in dismissal of a plaintiff's claim.  *See Reed*, 2004 WL 2115596, at *2.  For the following reasons, the Court finds that Plaintiff has failed to exhaust her administrative remedies as to her retaliation claim.

While the USPS only raised arguments on the merits as to Plaintiff's retaliation claim in its original memorandum in support of summary judgment, this Court cannot ignore the fact that it is clear from the evidence before it that Plaintiff failed to exhaust her administrative remedies as to this claim.[10]  There is simply no evidence in the record that Plaintiff exhausted her claim for retaliation.  The Court's review of the EEOC documents in the record, including the Final Agency Decision (Rec. doc. 15-4) and the EEO Investigative Affidavit (Rec. doc. 15-6) – completed by Plaintiff herself – reveals that the EEOC never considered a claim for retaliation, and that Plaintiff never raised one.[11]

---

[10] The Court notes that the USPS raised this argument in its reply memorandum.  (Rec. doc. 22).

[11] Plaintiff's original EEOC complaint is unfortunately not in the record, so this Court cannot determine whether Plaintiff checked the retaliation box on her complaint.  The evidence of record – especially the Final

While Plaintiff argues that as a *pro se* plaintiff during the EEOC proceedings, she should not be subjected to such an exacting procedural requirement as exhaustion, Plaintiff fails to cite to any case law to support her argument. The case law of the Fifth Circuit mandates that *pro se* plaintiffs exhaust their Title VII claims at the EEOC before filing suit in federal court. *Pacheco v. Mineta*, 448 F.3d 783, 788-89 (5th Cir. 2006). Indeed, the Fifth Circuit has recognized the two competing Title VII policies that the exhaustion requirement furthers:

> [o]n the one hand, because 'the provisions of Title VII were not designed for the sophisticated,' and because most complaints are initiated pro se, the scope of an EEOC complaint should be construed liberally.' On the other hand, a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in attempt to achieve non-judicial resolution of employment discrimination claims. Indeed, '[a] less exacting rule would also circumvent the statutory scheme, since Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance.'

*Id.* (citations omitted). That Plaintiff proceeded *pro se* before the EEOC does not absolve her of her obligation to exhaust her all her claims before that administrative body. Because Plaintiff failed to exhaust her retaliation claim, neither the agency nor this Court was put on notice of such a claim. Accordingly, this Court finds that it lacks jurisdiction to consider Plaintiff's retaliation claim.[12]

## V. Conclusion

For the foregoing reasons,

---

Agency Decision, which makes no mention of retaliation – are enough to satisfy the Court that Plaintiff failed to raise this claim before the EEOC.

[12] In her opposition, Plaintiff alleges for the first time that she was also discriminated against on the basis of her gender. (Rec. doc. 19 at p. 16). This claim was also not part of Plaintiff's EEOC complaint, it was not accepted for investigation by the EEOC, (Rec. doc. 15-5), and it was not part of the EEOC's Final Agency Decision. (Rec. doc. 15-4). Accordingly, this Court also lacks jurisdiction to entertain this claim as Plaintiff failed to exhaust it.

**IT IS ORDERED** that the Motion for Summary Judgment filed by Louis DeJoy, Postmaster General on Behalf of the United States Postal Service (Rec. Doc. 15) is **GRANTED IN PART** and **DENIED IN PART**.  The motion is granted as to Plaintiff's claims of disparate impact and retaliation but denied as to Plaintiff's claim of hostile work environment.

New Orleans, Louisiana, this ___1st___ day of _____April_____, 2022.

_____
**MICHAEL B. NORTH**
**UNITED STATES MAGISTRATE JUDGE**